## Mannin, Administratrix, et al. v. Ashland Iron & Mining Company.

(Decided January 22, 1918).

### Appeal from Boyd Circuit Court.

1.  Master and Servant—Safe Place to Work—Assumption of Risk.— It is the duty of the master to furnish the servant a reasonably safe place in which to perform his work. But, notwithstanding this, if the danger is so imminent or obvious that a person of ordinary prudence would not have undertaken the work, and the servant with such knowledge undertakes to use the place in the performance of his work, he will be deemed to have assumed the risk, and, if injured, the master will not be liable.

2.  Master and Servant—Contributory Negligence.—Although a place may be one where the servant in the performance of some parts of his duty may have a right to be, yet if he is injured at that place at a time when his immediate duties do not require him to be at that place, and at a time when it is obviously and necessarily dangerous, he will be charged with contributory negligence so that neither he, if injured, nor his administrator, if he is killed, may recover therefor from the master.

3.  Master and Servant—Assumption of Risk—Contributory Negligence.—The servant was fireman of the boiler on a locomotive crane which was adjusted upon a flat car so that it would revolve when being operated, and could also be made to revolve when the car was operating up and down the track. Besides firing the boiler, a part of the duties of the fireman was to throw switches when the crane was engaged in unloading or loading other cars. While thus engaged the crane was moving along the track for a distance of about eighty feet, and at the same time it was being revolved so as to get the boom in position, and while doing so the servant was caught by the boiler end of the crane, between it and the side of the car, sustaining injuries from

which he died. At the place of the injury the servant was riding on the car, but it was one of imminent and obvious danger, and was not a place where it was his duty to be at the time—Held that if the place was one where the servant had a right to be it was a risk which he assumed, because of the obvious danger, and if he had no right to be there he was guilty of contributory negligence, and in either event the master was not liable.

JOHN T. DEIDRICH and GEORGE B. MARTIN for appellants.

PROCTOR K. MALIN and HAGAR & STEWART for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The purpose of this suit filed by appellant and plaintiff is to recover damages from the appellee (defendant below) for the alleged negligent killing of plaintiff's decedent, Darius Mannin, which occurred in Ashland, Kentucky, on December 8, 1915.

A part if not the entire business of the defendant is the manufacture of pig iron from iron ore, and for that purpose it has an extensive plant and spacious yards in the city of Ashland. The west portion of its yards is occupied by its blast furnaces, where the ore is melted and cast into pig iron, while some several hundred yards further east is located the place where the pig iron is handled, loaded into cars and shipped to its various customers. In its general business of handling the ore, as well as the pig iron, and perhaps other products which it manufactures, the defendant has several railroad tracks in, about and upon its yards with one main track connecting the west with the east end of its yards. From the main track, at points where it was deemed necessary, side tracks or spurs which are used for the general conduct of the business have been constructed. In unloading the iron ore at its furnaces, and in transporting the ore from the furnaces to the eastern part of the yards over the main line connecting the two, and unloading the ore after being so transported, the defendant uses a contrivance called a locomotive crane. Perhaps a better description than we can give of a locomotive crane is found in the briefs, from which we quote: "They consist of a two-truck flat car on which is mounted a cab and boiler, and from the base of which an iron boom extends; on the extreme end of this boom there is attached either a magnet or a clam-shell bucket, the movements of which are controlled by the operator of the crane, who is stationed in the cab. On and

in the center of the body of the flat car there is mounted a circular disc or base which is equi-distant from either end of the flat car and covers practically the entire width of the car. On this circular base or disc the boiler, the cab, and the boom of the crane are mounted, and under the control of the crane operator can be revolved in a rotary motion on this base. The boom extends out from the base and in front of the boiler and cab, all being capable of being moved in a complete circle on a fixed orbit so that each end of the flat car may be designated, in turn, as the head end, or front of the crane, depending upon which direction the boom is pointed. There is no fixed frontal position for the crane, and what in any instance is the front of the crane is determined solely by the direction along the track in which the boom of the crane is pointed.

"In addition to the circular or rotary motion of the crane, the car on which the boom, boiler and cab are mounted can also be propelled back and forth along the track by means of other gears, all of which are operated and controlled from the cab by the operator."

The revolving part of the machine which contains the boiler, cab and the boom, with the machinery necessary to operate the latter, has on one end of it the boom, and on the other end the boiler and cab, all of which extend out over the circular disc or base upon which it rests, leaving the space between the floor of the flat car and the part of the machinery which projects beyond the disc of some three or four inches. When the machinery is adjusted straight with the flat car the boiler end of the revolving part of the machinery comes within sixteen or eighteen inches of the ends of the flat car upon which it rests. When revolving, both the boiler end and the boom extend out beyond the sides of the car. At the corners of the car and to its floor were attached an iron rod called a grab iron, and when originally constructed the car had a stirrup or step immediately under the grab iron fastened to the outside sill of the car. At least some ten or twelve inches of the space occupied by the grab irons was covered by the radius made by the boiler end of the crane when it would revolve. When handling the iron ore the boom would operate with some kind of basket, but when handling the pig iron a magnet would be used operated by electricity flowing through wires connected with the machinery, and which were connected with charged wires

running along poles by the side of the track by means of a plug in the poles.   In unloading a car of pig iron the locomotive crane would operate from one end of the car being unloaded, but the boom was not long enough to reach beyond the center of that car, thus necessitating the transferring of the locomotive crane to the other end of that car so as to unload that end of it.

Upon the occasion of the accident, which occurred about eight o'clock in the morning, some pig iron was being unloaded in this manner from a car standing on the main line connecting the west with the east end of the yards, and was being placed in a pile at the side of the track.   The west end of the car had thus been unloaded, and the process of transferring the locomotive crane to the other end was commenced.   The usual way, and the one adopted upon this occasion, was for the locomotive crane to push the car containing the pig iron to a point where a switch was connected with the main line, and for both of them to pass that point, when the switch would be thrown and the locomotive crane would then move backward, itself taking the switch but pulling the loaded car with the projecting end of the boom on the main track, the switch being thrown after the locomotive crane had passed over it, and the loaded car continued on the main line and would pass the switch sufficiently for it to be clear.  The locomotive crane would then move forward off the switch on to the main line and then back up to the end of the car containing the pig iron, from which it would unload that end.   Before the unloading could commence the revolving part of the crane would have to be turned so as to place the boom in an opposite direction from that which it occupied at the unloading of the first end of the car.

Upon the occasion complained of this process had been followed and the loaded car had pulled back on the main track after the locomotive crane had taken the side track, and the former had been stopped by the decedent, who was riding it for the purpose of applying the brakes, which was a part of his duties.   About the time it stopped the locomotive crane started forward so as to get from the side track on the main track and enable it to back to the unloaded end of the car containing the pig iron. While going forward, its operator set in motion the machinery which revolved the crane.   This was done while traveling, as is explained, for the two purposes of having

the crane adjusted so as to immediately begin the unloading of the car when the two should be connected, as well as to take advantage of the open space at that point necessary to revolve the crane, it being shown that much of the space along the track was so obstructed with poles, wires or piles of iron that the turn of the crane could not be made. The distance which the locomotive crane had to travel after starting to leave the switch to get on the main line was only about eighty-three feet, and after it had traveled something like half that distance a witness discovered that the decedent was standing with his feet upon some part of the trucks of the flat car, with one hand holding to one of the grab irons, and the boiler end of the crane in revolving had caught him and mashed him so that he immediately died. He had placed himself within the radius of the boiler end of the crane as it revolved so that he was caught as though he had been clamped with an instrument like unto a pair of scissors.

The primary duty of the decedent was to fire the boiler of the crane, keep it supplied with water, and to look after the machinery generally, although it was also a part of his duties when necessary, to throw switches and to assist in plugging the electric wires into the poles, but another servant called a "spotter' also looked after these matters, and upon this occasion the latter threw the switch in the process we have described in getting from one end of the loaded car to the other. The last time the operator of the crane saw decedent was about the time he stopped the loaded car on the main line. He did not see him after that until after the accident.

The negligence complained of is: (1) that decedent was not furnished a safe place in which to work; and (2) that it was the duty of the operator of the crane while revolving it to keep a lookout for the location of the fireman and if he was in a position to be injured by the revolving of the machine to take such care as was necessary to prevent it.

The answer, aside from containing a traverse, pleaded contributory negligence and assumption of risk, both of which were denied, thus making the issues. Upon the trial the court sustained the defendant's motion for a peremptory instruction, resulting in a verdict discharging it from liability, and from the judgment based thereon this appeal is prosecuted.

It is contended on the appeal that plaintiff sustained both her grounds of complaint. We will briefly consider them in the order mentioned.

Perhaps no rule of law is better settled than the one requiring the master to furnish his servant a reasonably safe place in which to perform his work. An essential prerequisite to the application of this rule is that the place where the injury occurred was one where the decedent had to perform his work, or the particular work in which he was engaged at the time. A place might be one which the servant had a right to use in performing some portions of his general duties, and it might be reasonably safe when being thus used, but it does not necessarily follow that the servant could use that place in the performance of all of his duties, nor that the place would be reasonably safe in the performance of some of them. It is insisted, in support of this contention, that the grab irons were placed upon the flat car of the crane for the purpose of holding on to when the crane was moved up and down the track, and there is some evidence to the effect that when traveling from one part of the yard to another part the brakeman and fireman did sometimes ride in this manner. But even upon this point the great weight of the testimony is that the purpose of the grab iron was to enable one who had occasion to mount the car to do so, and that it was not intended by placing them on the car to make a place where one could ride. But, conceding that the testimony is sufficient to show that this was the customary course while going from one part of the yard to another, there is certainly nothing to show that the place was one where the decedent had a right to be or to perform any portion of his work during the process of unloading a car.

On this particular occasion there was no trip being made from one portion of the yard to another. On the contrary, the crew at the time was engaged in unloading a car, and the act of getting from one end of it to the other, although it involved the moving of the crane up and down the track for a short distance, is an entirely different work from that of moving the crane from one part of the yard to another. In the one the crane is usually revolved, while in the other it is not. The small amount of travel in the former case is a necessary act in the unloading process, and constitutes a part of it. Some ten or twelve cars were unloaded each day in the same man-

ner, and in unloading each of them the crane would revolve one-fourth around at least one hundred times, the entire revolution being made once for each car unloaded. The decedent had worked at that particular job for three days, and had witnessed the operations described. He had been in and about the yards for a considerable time prior thereto, and had seen the workings of the crane while in operation. At one time he had repaired one or more of them. He was thirty years of age, a man of intelligence, and there is nothing to show but that he was perfectly familiar with the movements of the crane, even as much so as the operator himself. In addition, the operator says in his testimony, which is denied by no one: "I told him (decedent) the first morning he came on the crane, had to swing the whole thing around and for him to be careful when it was switching, and he said he knowed all about the thing, that he had run a log roller up in the mountains something like one of these—locomotives—these cranes—he seemed to know all about them."

It is undisputed that the crane when revolving made a very loud noise because of the working of the cog wheels necessary to make it turn, and even if plaintiff did not see the revolution being made, he could not help but hear it. The crane when moving traveled no faster than a man walking, and even if the decedent had occasion to go from the car loaded with pig iron, which he had stopped on the main line, to the switch, which as we have seen was only about eighty-three feet, and at which the spotter was located for the purpose of throwing the switch, he could have walked and kept up with the crane. To have taken hold of the grab iron at the time for the purpose of riding the car containing the crane when the latter was revolving, thus placing his body within the radius of the revolving crane, was such a piece of gross negligence as that it is difficult for us to see how there can be any room for the application of the safe place doctrine. Even if it should be held that the place where decedent was injured was one that he had a right to use at the time in performing his work, and that the decedent was using it at the time in such performance, still it was so obviously dangerous that the law imposed upon him the duty to refrain from using it, or, if he did, to assume the risk. Phillips v. Corbin & Fannin, 166 Ky. 693; Stearns Coal & Lumber Co. v. Calhoun, *idem*, 607; Concannon v. J. L.

Strassel Paint & Roofing Co., 167 Ky. 141; Carter Coal Co. v. Howard, 169 Ky. 87; Corbin Ice & Carbonating Co. v. Ellison, *idem,* 250; Wilson v. Chess & Wymond Co., 117 Ky. 571; McCormack Harvesting Machine Co. v. Liter, 23 Ky. Law Rep. 2154; Ada Coal Co v. Linnville, 172 Ky. 2; Southern Railway Company in Ky. v. Mauck, 152 Ky. 498, and many other cases which might be cited.

Even if decedent had been expressly directed to take the position which he occupied at the time of the accident, under the conditions and circumstances then existing he would have been guilty of contributory negligence because of the obvious danger. Ada Coal Co. v. Linnville, *supra,* and Illinois Central Railroad Co. v. Carter, 154 Ky. 373. To hold the defendant liable in this case under the safe place doctrine would not only be a departure from the rule which this court has consistently followed, but would also be giving our sanction to grossly negligent conduct on the part of the servant, and would be a license for all persons working about machinery to close their eyes and stop their ears to all dangers to which they might be exposed.

But it is insisted (2) that it was the duty of the operator of the crane to keep a lookout for the whereabouts of the decedent, and to take such steps as might be necessary to protect him if he was in a dangerous situation. In the first place we find no evidence that such was a part of the duty of the operator. He seems to have had his hands full to properly attend to the operation of the machinery in his charge. He not only had to manipulate that part of it which propelled the car up and down the track, but also that part of it which revolved the crane, and it was furthermore his duty to watch the boom in making the revolution so as to prevent it from coming in collision with obstructions. He had a right to assume that the fireman would not put himself in a place of inevitable danger, and we have been unable to find any law which under the circumstances would require the operator to become the guardian for the protection of a servant shown to be as familiar with the dangers as the operator himself. Besides, owing to the construction of the crane and the boiler cab, the location of the fireman at the place where he was injured could not have been seen by the operator unless he would either get out of the cab or stick his head out far enough to see. He could do neither of these acts without neglecting his multiplied duties in

which he was engaged at the time. He had a right to assume that an adult, and intelligent servant, would exercise at least ordinary care for his own safety. To impose such a duty on the operator as contended for would greatly retard the work, and it would relieve those of less onerous duties of exercising even ordinary care for their own safety.

The position which plaintiff occupied at the time of the accident is somewhat analogous and might be likened unto that of a person on a railroad track when he knows a train is approaching, for the revolving of the crane was no less dangerous to one occupying the position of decedent than would be the position of one on a railroad track when a train is approaching. We fail to find either in the evidence or in the law any authority for the application of the principle contended for in plaintiff's second ground of complaint, and the court did not err in disallowing it.

Wherefore, the judgment is affirmed.