## Lay's Adm'r v. Harlan Producers Coal Corporation.

(Decided Feb. 7, 1936.)

J. B. CAMPBELL for appellant.

H. H. OWENS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

For some four or five years previous to July 27, 1934, Charlie Lay was in the employ of the appellee and defendant below, Harlan Producers Coal Corporation, mainly as a practical electrician. His duties chiefly consisted in constructing and maintainng outside wiring for telephone and electrical purposes in the operation of defendant's small coal mine, and in furnishing and supplying its miners' residences with such utilities, as well as supplying the company itself with them. As such employee he had prior to that time constructed and installed an electrical power line upon the grounds of defendant by which electricity was conveyed into its mine, and from such power lines into the residences of its employed miners. He had also constructed a telephone line connecting defendant's commissary with its tipple and with its mine. As constructed the power line, with the necessary transformers on some of its posts, was located on one side of an inclined track over which the coal was carried from the mine on the top of the mountain to its foot in some small coal cars, where, as we understand, was located defendant's tipple; and the telephone line (also constructed by him) was on the other side of that inclined track some 150 feet from the electric power line. The telephone line was, at places on its route, attached to saplings where they were conveniently located, and to posts where there were no convenient saplings. The wires of the telephone line had gotten out of repair so that it could not be used for the transmission of messages, and on the day mentioned Lay undertook to and embarked on the task of repairing it. The tools with which he worked in discharging his duties as such line-

man were furnished by himself and belonged to him. Defendant's mine is in Knox county and its stock is chiefly owned by Robert Wheeler.

The disrepair of the telephone line that Lay undertook to correct consisted in the wearing away in places of the insulation of the two twisted wires forming it, so that the naked wires would come in contact and produce a short circuit preventing conversation over it, all of which Lay knew and undertook to repair. Some time after 7 o'clock a. m. on the day mentioned, he asked Mr. Wheeler to permit Charlie Hammons to assist him in making the repairs, and which request was granted. He then took his tools, and with the assistance of Hammons removed the telephone line from the trees and posts to which it was attached and replaced insulated wires at all sections where the insulation had worn away. After that was done he concluded that he would remove the telephone line from where it had theretofore existed and attach the wire to the posts of the high-powered electric line to which we have referred, and which, as we have seen, was some 150 feet away from the telephone line as theretofore erected and maintained. The method of attaching the telephone wire to the posts was by means of hangers driven therein, and then wrap the wire around them after being so driven, and that method was pursued by Lay in attaching the telephone wire to the posts of the electric line at a point on them about midway between the ground and the high-powered electric line at the top of the posts, which was some 25 feet or more above the ground. When he arrived at a post upon which there was a transformer (that he had also installed on that electric line), he discovered that the elevation that he had adopted was not high enough to keep the telephone wire from resting on a fence between that post and the next one below it. Some 4 or 5 feet below the high-powered wire on that post were some individual service wires running to some mining houses and carrying an electrical current of 110 volts. Lay then concluded to elevate the telephone wire on that post, and he ascended it to a point where the service wires left it and projected his body a short distance between them, when Hammons, who was on the ground helping to stretch the wires, observed him looking to the top of the post where the

high-powered wire was attached and where the transformer was located, when he appeared to give way and slid down the post and died an hour or so after being taken to a hospital, and following a number of efforts to resuscitate him.

Joe Cook was thereafter appointed administrator of his estate and brought this action against defendant in the Knox circuit court to recover damages for his death, which plaintiff alleged was produced by its gross carelessness and negligence whereby his decedent lost his life by electrocution. The answer denied the material averments of the petition, and at the trial the court sustained defendant's motion for a peremptory instruction in its favor at the close of plaintiff's testimony, followed by a verdict in favor of defendant as so directed, and plaintiff's motion for a new trial having been overruled, he prosecutes this appeal. The court in its order sustaining defendant's motion for a peremptory instruction did not state the grounds therefor; but counsel for both sides argue in their briefs in this court the only two possible ones upon which the action of the court could be predicated and they are: (1) That decedent's death was not produced by electrocution as plaintiff contends, but was the result of some other cause, either heart failure or sunstroke, since the day (according to the proof) was an extremely hot one and decedent appeared to be greatly fatigued from the heat during the progress of his work; and (2) that even if decedent was electrocuted from the current carried by the service wires with which he voluntarily came in contact, defendant nevertheless would not be liable, since there was neither an implied nor express direction from its employer to relocate and reconstruct the telephone line by attaching it to the post of the high-powered electric line. Those only possible grounds will be disposed of in the order named.

■ There is considerable proof of a more or less convincing nature sustaining ground 1, but defendant's theory with reference thereto is to some extent contradicted, and which, to say the least of it, made an issue for the jury to determine whether or not it was true, and because thereof the court's directed verdict for defendant may not be sustained on that ground.

■ Our appraisement of the testimony leads us to a different conclusion with reference to ground 2. The record uncontradictedly shows these facts: That decedent furnished his own tools and appliances with which he performed his work as lineman and electrician. He was practically his own boss. The task that he was performing was that of repairing the telephone line of his master, and which the latter had so directed him to do, but of course he exercised his own discretion as to the methods he would employ in accomplishing that result. The disrepair of the telephone line did not consist in any defects in the routing or location or in the manner or method of its construction, since as we have seen the only proven defect in it was the worn-off insulation of some of its wires at some places along its distance. Instead of repairing those places and re-establishing the line along its old route, Lay concluded to relocate it and to construct it on posts carrying high-voltage currents of electricity. In making that radical change and alteration he clearly departed from the duties that defendant had assigned to him, and which relieved it from any alleged failure to maintain the place where its servant met his death in proper safe condition for those whose duties might call them to work at it. If Lay had been assigned the task of doing something to the electric line and had met his death because of dangerous conditions that it was the duty of his master to correct, a different case would be presented. The facts, therefore, present a case where the servant was injured and killed (conceding that he was electrocuted) because of a departure from his assigned task and voluntarily pursuing a course at a place of his own choosing and which was never in the contemplation of his master for him to do. By so doing he exceeded the scope of his employment and thereby relieved defendant of liability to him for any dangerous condition of the electric wiring.

Negligence for the consequences of which a master is liable to his servant consist not merely in a general breach of duty on his part, but it must also appear that such breach was the violation of a duty that the master owed to the particular servant at the time and place when and where the latter was injured. Louisville, H. & St. L. R. Co. v. Wright, 170 Ky. 230, 185 S. W. 861, 863, Komonyi, Adm'x, v. Consolidated Coal

Co., 182 Ky. 683, 206 S. W. 883. See, also, West Kentucky Coal Co. v. Smithers, 184 Ky. 211, 211 S. W. 580; Id., 188 Ky. 224, 221 S. W. 558; Nelson Creek Coal Co. v. Bransford, 189 Ky. 741, 225 S. W. 1070; Louisville & N. R. Co. v. Hocker, 111 Ky. 707, 64 S. W. 638, 65 S. W. 119, 23 Ky. Law Rep. 982, 1274; Hollingsworth v. Pineville Coal Co., 74 S. W. 205, 24 Ky. Law Rep. 2437; Emmett v. Mitchell-Tranter Co., 80 S. W. 1148, 26 Ky. Law Rep. 303; Shadoan's Adm'r v. Cincinnati, N. O. & T. P. Co., 82 S. W. 567, 26 Ky. Law Rep. 828; and other cases found in 13 West's Kentucky Digest, Master and Servant, beginning on page 350, sec. 89, and on page 389, sec. 128. Those cases, with many others that could be cited, are in accord with the general rule, to the effect that a servant who departs from the performance of his task as directed by the master and pursues a course or method not contemplated by the latter, and which he did not direct, either expressly or impliedly, and is injured while pursuing such departing course, may not recover from the master therefor, although such injury may have resulted from the act of general negligence on the part of the master; the reason therefor being that in such circumstances the master violated no duty he then and there owed to the particular injured servant, since he neither directed nor had reason to anticipate that his servant would come in contact with such negligently produced condition because his assigned duties did not call therefor. The general act of negligence of the master in such circumstances is not considered by the law as the proximate cause of the servant's injury, and when such conditions appear a failure of proof is produced compelling a directed verdict in favor of the master; but which would not have been true had the servant been injured when performing his duty in the manner and at the place that was required for it to be done, and which was in the contemplation of the parties when the servant undertook its performance. Any other rule would render the master liable to any servant upon his premises for any injury sustained thereon through any act of ommission or commission of the master, although the injured servant at the time was not engaged in performing the specific task assigned him, but was performing an entirely different one, pursuant to a method of his own choosing and completely departing from the scope of his immediate employment.

As we have seen, decedent in this case was assigned and undertook to perform only the duty of *repairing* the telephone line—not to relocate and reconstruct it—and if he had confined himself to that task there would have been no occasion for his coming in contact with any electrical wiring, regardless of the condition in which it was maintained. The danger he encountered was of his own exclusive selection, and for which the defendant, his master, under the doctrine of the cases and authorities supra, may not be held liable, although the dangerous condition was the result of negligence on the part of his master, and for the consequences of which it would be liable to a servant whose duties required his presence at the place where the danger existed.

It is shown by the record that defendant was eligible to operate under our Workmen's Compensation Statute (Ky. St. sec. 4880 et seq.) but had failed to do so. We have, therefore, refrained from discussing questions of the decedent's contributory negligence or his assumption of risk, since the Compensation Act, supra, eliminates those defenses in actions like this where the master declined to accept the statute and to operate his businss thereunder. However, the law is (and which is approved by the domestic cases supra) that the failure of defendant to operate under the statute does not dispense with the necessity of allegation and proof of actionable negligence toward plaintiff and that it proximately caused the servant's injury or his death. As we have seen, the negligence of defendant herein, if any, to properly maintain its electric line, was no violation of duty it owed to decedent herein, since he had temporarily departed from the scope (sometimes called "ambit") of his employment, and it could not be anticipated by defendant that he would do so and thereby bring himself in contact with the dangerously maintained condition of its electric wires if any existed.

Particularly applicable to the situation here, and completely supporting the proposition just discussed, is the Wright Case, supra, and also the later ones of Mannin v. Ashland Iron & Mining Co., 178 Ky. 734, 200 S. W. 21; Louisville & N. R. Co. v. Parsons, 213 Ky. 432, 281 S. W. 519; Broadway Coal Mining Co. v. Render (Ky.) 119 S. W. 198, 199 (not elsewhere re-

ported); and others referred to in those opinions. They deal more particularly with the safe place doctrine, and the actions arose from injuries produced because of unsafe conditions where the servant actually performed his work, but which was a place different from the one to which he had been assigned by the master for such performance. Their facts need not be recited here. They may be obtained by a reading of the opinions, the legal conclusions of which are, that when the servant makes such departures in the performance of his duties no responsibility attaches to the master if the servant is injured at the place he selected, even though it be dangerous and which was the result of negligence on the part of his master. Our final conclusions in the Wright Case upon such facts were thus expressed: "There being no violated duty which the defendant owed to the plaintiff shown in this case, it was incumbent on the trial court to have sustained the motion for a peremptory instruction." In the Render Case we expressed our conclusions upon the same point thus: "The duty of the master to furnish a reasonably safe place applies only to the place which the employee is required to use for the purpose of performing his duty." A number of other cases equally in point are collected in the Parsons opinion, and there can be no doubt that the principle is firmly settled in the law.

It follows, therefore, that the court correctly sustained defendant's motion for a directed verdict in its favor, and the judgment based thereon is affirmed.