## Riley v. Louisville & Nashville Railroad Company.

(Decided November 19. 1929.)

LAWRENCE J. MACKEY and EDWARD L. MACKEY for appellant.

TRABUE, DOOLAN, HELM & HELM, A. M. WARREN and JAS. P. HELM, JR., for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY— Affirming.

The appellant, Marguerite Riley, was severely injured while a passenger on appellee's train, which was wrecked, apparently for the purpose of robbery, by the action of two or more men in breaking and turning a switch and diverting it onto a side track and loosening some rails. This occurred about midnight of September 5, 1925, at Knob Lick, in a hilly and sparsely settled section of Lincoln county. The train was a heavy, fast, and through one, from Louisville to Atlanta. The appellant, in company with some other young ladies, was

on her way to Crab Orchard, not far from the place of the wreck. At the conclusion of all the evidence heard in her suit for damages, the trial court directed a verdict for the railroad company, and this appeal is from the judgment entered thereon.

Two men, on pleas of guilty of murder of the engineer, who was killed in the wreck, have been sentenced to life imprisonment in the penitentiary. We are called upon to say whether there are any circumstances shown in this record which give to appellant legal redress against the railroad company for her injuries resulting from this atrocious crime, conceived in devilish malignity and executed with diabolical cruelty.

The law is that one cannot be held accountable for the tort or criminal act of a third person having no relation with the one being charged, unless he was guilty of the violation of some duty connected with the crime or act of the other. If the injury was the result of concurring causes, for one of which the defendant is responsible, he must answer in damages, such as where it was the result of his negligence and an accident combined, or his negligence co-operated with an act of God, such as lightning, or with a criminal act committed by another. In such cases the one guilty of the negligent act will be held liable for the consequences, if the injury should have been reasonably anticipated, and would not have happened, but for his negligence; that is, if his negligence was the proximate cause. City of Louisville v. Bridwell, 150 Ky. 589, 150 S. W. 672; Cohen & Stryck v. Home Telephone Company, 179 Ky. 107, 200 S. W. 344; L. & N. v. O'Brien, 163 Ky. 538, 174 S. W. 31, Ann. Cas. 1916E, 1084. The basis of this liability is the negligent act of the person charged, which permitted the other factor to operate on or affect the person injured.

The subject of proximate cause is treated at length in Nunan v. Bennett, 184 Ky. 591, 212 S. W. 570. Not all negligence is actionable. It is only when the damage sustained is the natural and probable result or consequence, which ought to have been foreseen or reasonably anticipated in the light of the attendant circumstances. While not involving a passenger, the court had for consideration the liability of a carrier for negligence concurring with an act of a third person in Watson v. K. & I. Bridge Company, 137 Ky. 619, 126 S. W. 146, 151, 129 S. W. 341. In that case it is pointed out that, if the act of a man striking a match in the midst of gasoline

vapors let loose by the defendant's negligence was lacking in malice, the defendant was responsible for resulting damage, as it should have understood enough of the consequences to have foreseen that an explosion was likely to result from the inadvertent or negligent lighting of a match by some person who was ignorant of the presence of the gas. But if the act of the man striking the match was malicious, it was one which the defendant could not reasonably have anticipated or guarded against, and in such a case that person, and not the defendant, should be considered the efficient or proximate cause of the plaintiff's injuries. We quote from the opinion:

> "The mere fact that the concurrent cause or intervening act was unforeseen will not relieve the defendant guilty of the primary negligence from liability, but if the intervening agency is something so unexpected or extraordinary as that he could not or ought not to have anticipated it, he will not be liable, and certainly he is not bound to anticipate the criminal acts of others by which damage is inflicted and hence is not liable therefor. 29 Cyc. 501-512; Sofield v. Sommers, 9 Ben. 526, 22 Fed. Cas. 769, No. 13, 157; Andrews v. Kinsel, 114 Ga. 390, 40 S. E. 300, 88 Am. St. Rep. 25."

See, also, Nelson Creek Coal Company v. Bransford, 189 Ky. 741, 225 S. W. 1070.

In the application of these general rules to cases involving criminal acts of strangers, it has often been declared that a common carrier is not the insurer of the safety of its passengers as against the consequences of felonious acts done by persons not in its employ and over whom it has no control, although it may be held liable for a negligent failure of its employees to protect the passengers by the use of means at their command in the exercise of a proper degree of care. While the highest degree of care is demanded, the carrier is bound to guard only against those occurrences which can reasonably be anticipated by the utmost foresight. "It has been well said that 'if men went about to guard themselves against every risk to themselves or others which might, by ingenious conjecture, be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as

probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' '' Atchison Railway Company v. Calhoun, 213 U. S. 1, 29 S. Ct. 321, 323, 53 L. Ed. 671 (quoting Pollock on Torts).

So passengers on railroad trains necessarily incur the risks and perils incident to travel over which the carrier has absolutely no control, and which are wholly without its agency, such as unforseen accidents against which human care and foresight could not guard, hidden forces of nature, unknown to common experience, and acts of strangers which could not reasonably be expected. 4 R. C. L. 1139.

With respect to the duty of common carriers and their liability for the act of other, like that before us, it is said in Shearman & Redfield on Negligence, sec. 500: ''Hence, they are not ordinarily liable in case of derailment of a train by train wreckers unless the condition of the track could have been discovered in time to have prevented the derailment by the exercise of the high degree of care in making inspections required by law.''

In such cases the carrier must have been remiss in not discovering the act of the wrongdoer or the resulting conditions in time to avert the injury. This does not require an impracticable character or extent of precaution, which could not be observed without so ruinous a cost as to destroy the business. Fredericks v. Northern Central Railroad Company, 157 Pa. 103, 27 A. 689, 22 L. R. A. 306. In that case a boy criminally misplaced a switch and caused two cars to run wild and collide with other cars. There is this note in the annotations, based upon several authorities: ''A railroad company is not liable to passengers for accidents caused by torts of third persons tampering with the rails or switches, where the company has exercised due care in operating the road.''

The appellant maintains that the appellee company on the occasion under consideration was negligent in three respects, and by reason thereof her injuries were sustained, namely: (1) By having located the switch on a curve, so that the engineer could not see it and its signals in time to avert danger at the switch; (2) in the operation of the train because of the failure of the fireman to maintain a lookout at the time; and (3) in failing to use proper safety appliances in the operation of the train.

1. Little attention need be given the first point. The evidence showed that the track ran through a mountainous country, with many sharp curves and heavy grades; 75 per cent. of the line of which this is a section being made up of curves, some of which are as great as 7.50 degrees. The curve at this point is less than 1 degree. We have been cited to no authority sustaining the view presented, and there doubtless is none, for the proposition is so extravagant as to answer itself. There was certainly no violation of any duty owing the plaintiff in this regard.

2. The evidence was uncontradicted that the tracks and switch lamp were in good shape. The switch lamp was one equipped to burn day and night for eight days without refilling. It had been filled, cleaned, and lighted that afternoon, and was burning two hours before the wreck. But it is contended that the fireman, had he been in his seat, could have seen the switch light, had it been burning, for a greater distance than the engineer, and that he should have been there, and have noticed as the train approached that there was no light on the switch stand, and consequently have known that something was wrong. Just before the wreck, the fireman had been engaged in firing his engine, which it is shown is his primary duty. He was climbing upon his seat when the engineer put on the emergency brakes and exclaimed that they were running into a bunch of cattle, and as he testifies: ''Just immediately afterwards he hollered that the switch was open, and just about the time he hollered we went into the switch, and the engine came near turning over—I thought it was going to turn over—and it run about four or five car lengths on the siding, and run into these cars, and the engine turned over.'' It is apparent that the engineer did not discover the switch was open until the headlight of his engine was cast on the rails at that point. It is not contended that the engineer failed to do everything humanly possible to stop the train after discovering the condition.

The so-called ''lookout duty'' upon which appellant relies, is ordinarily owed to persons upon the tracks; but it exists only where the presence of persons or objects on or near the tracks is to be anticipated, and does not extend to rural or sparsely settled communities, such as this place. Sizemore, Adm'r. v. L. & E. Ry. Co., 169 Ky. 497, 184 S. W. 383. That particular rule is hardly applicable. Of course, it may be said that, in the exer-

cise of the very high degree of care required, the appellee's agents in charge of a train should not run it blindly, but should maintain a lookout for obstructions into which the train might be running. It does not appear, however, that, had the fireman on this occasion been observing ahead, he could have discovered the open switch sooner than the engineer. It could only be discovered when the headlight swung around on the switch point As stated, there was no switch light there, as it had been extinguished by the bandits. There is no proof of any luminous object by which those in charge of the train could have known they were immediately approaching the switch, and hence have realized sooner that something was wrong by reason of the absence of the switch light.

The case of Gray v. B. & O. Company, 24 F. (2d) 671, 675, 59 A. L. R. 461 (C. C. A. 7th Circuit), is strikingly like this one. A switch lock was sawed and a switch turned, resulting in the wreck of the train, which killed the engineer and injured the plaintiff. That criminal was also apprehended and convicted. It was contended there, also, that the agents in charge of the train were negligent in failing to observe that the switch light was out and in stopping the train before it reached that point, the same as argued here. Respecting the point, the court said:

"Plaintiff's argument assumes that the engineer was bound to know where the switch light was, and also that he was bound to know, almost on the second, where the switch stand was, even without any light upon it. The only way the engineer could have known what switch light it was, had the light been burning, was from its relation or position with reference to other known objects. Whether the train was on time on that night does not appear. Whether there was any time scheduled for its passing Aviston, or whether it passed Aviston at the same time every night, are matters that do not appear; so it cannot be said that the engineer should have known, on that account, when he came to the switch because of its proximity to Aviston."

It cannot be said that, under the circumstances, there was negligence in the failure of the engineer to discover the conditions sooner, or the failure of the fireman

to be on the lookout. Hence there is no merit in this point made by appellant's counsel.

3. The major ground submitted as an act of negligence on the part of appellee is that it should have equipped its lines of railroad at the point of the disaster with such signals and appliances as would have given the train operators notice of the open switch before it came in view. There are in use, according to the contentions of appellant, three such devices or appliances, namely, the "block system," the "distance signal," and "automatic train control." We are cited to several authorities to the effect that a carrier, in the exercise of the high degree of care imposed on it, is obliged to adopt and use the latest improved practical appliances tending to prevent injury, and which contribute to the safety of its passengers. That law is thus epitomized in 4 R. C. L. 1204:

> "Carriers of passengers are bound to avail themselves of all new inventions and improvements known to them, which will contribute materially to the safety of their passengers, whenever the utility of such improvements has been thoroughly tested and demonstrated, if the adoption of such improvements is within their power so as to be reasonably practicable. They are not, however, bound to adopt every new and untried invention, nor are they required to adopt excessively costly improvements, nor to incur such great expense as would make it impracticable for them to carry on their business."

In this state this law appears to have been considered only in Kentucky Central Railroad Company v. Thomas' Adm'r. 79 Ky. 160, 42 Am. Rep. 208 (decided in 1880). There was evidence in that case that the "Weston-house" air brake was more efficient in arresting the progress of the train than the brake in use, and it was contended that the use of such air brake would have prevented the wreck in which the plaintiff's intestate was killed. After referring to the duties of a carrier to its passengers, it is said in the opinion:

> "They are bound to provide a road, and engines and cars, free from all defects which endanger the lives of passengers, and which might have been discovered by the closest and most careful scrutiny of competent men, and to employ competent and trustworthy persons to operate and manage

their roads, engines, and cars, but are not liable for casualties which human sagacity cannot foresee, and against which the utmost prudence cannot guard. Nor have they discharged their whole duty when they have provided the things just mentioned. They are bound to add to them such apparatus and appliances as science and skill shall, from time to time, make known, and experience shall prove to be valuable in a considerable degree in diminishing the dangers of railroad travel, provided such improvements can be procured at an expense not greater than ought to be incurred to obtain them.''

Holding that the evidence as to the improved brakes was competent as conducing to prove negligence which contributed to the accident, the qualification of the rule was thus expressed:

''That we may not be misunderstood, it is proper to remark that we do not intend to decide that a company able to do so is bound always to provide the very best improvement that may be known to practical men, but only that it must provide that which is reasonably good when compared with that which has been proved by proper practical tests to be the best.''

The following is a composite statement of the qualifications of the broad rule as to this important duty: The devices or appliances need not be the best possible preventive which the highest scientific skill might suggest. They must have been demonstrated to be safe and efficient, and be in general use under similar conditions. They must not be so excessively costly as to be impractical for carrying on business of the particular carrier. In a sentence: They must be practical from a pecuniary as well as a utilitarian standpoint, and materially diminish dangers incident to the mode of transportation employed. 4 R. C. L. 1204; 10 C. J. 955; Thompson on Negligence, sec. 2787; Shearman & Redfield on Negligence, sec. 51.

In the application of these principles, we may repeat what was said in the Thomas case, supra: ''We have not anywhere met with a rule by which to determine, in a given case, whether it is the duty of a railroad company to provide a designated improvement for use on its trains.''

In L. & N. v. Heinig's Adm'r, 162 Ky. 14, 171 S. W. 853, the trial court had given an instruction respecting the failure of the railroad company to equip its line with the block signal system. This court held that such an instruction was not proper, because the plaintiff's intestate was an employee, and well knew the conditions, and had assumed the risk involved. For that reason it was considered unnecessary to discuss the question when or under what circumstances a railroad company is required to adopt the block signal system for the operation of its trains. It is pointed out, however, that there is no statute requiring such installation.

The portion of appellee's railroad here involved appears from the evidence to be preponderantly a coal-carrying line, with only three passenger trains a day in each direction. It is called the "Lebanon Branch," and the evidence introduced by the plaintiff did not prove that the appliances suggested were in general use on similar lines, although it did show use, not only by the appellee company, but by other carriers, on their main or more heavily traveled lines. Neither was the evidence sufficient to show that their use would have probably prevented this catastrophe. On the other hand, the company showed that on what is commonly called "class 1" roads the automatic block signals were in use on an average of less than 50 per cent. of the main tracks, and practically none on branch lines. It was further shown that the primary use of automatic block signals is to facilitate traffic, by allowing trains to move closer together, although the system tends to increase the degree of safety in operation.

Plaintiff's and defendant's witnesses testified the effectiveness of the automatic block system in a particular instance depends on the location of the signals; for example, if the switch was opened after the train passed the nearest block signal, it would not have disclosed the danger. In any event, as was shown, it is not difficult for one bent upon mischief to connect the opening made by a thrown switch, so as to keep the signals from disclosing that condition.

One witness for the plaintiff, with hardly sufficient qualification, expressed the opinion that a "distance signal" should have been used to protect the switch, and yet admitted that such signal would not prevent wrecks. The overwhelming evidence of a substantial nature was to the effect, however, that the "distance signal," inde-

574

pendent of the automatic block system, is considered obsolete and ineffective. It was shown that there was only one such signal in use on the entire Louisville & Nashville system, and there are few roads now using such device at all.

Neither did the plaintiff show that any automatic train control device was in common or general use. In fact, her counsel appear to have abandoned the idea that such a system of protection is required by the law as above given.

In conclusion it may be said that, under the most favorable construction of the evidence, it is not made to appear that the act of those who wrecked the train could have been anticipated or guarded against, and there was no failure by the company to exercise its legal duty to the passenger, which can be construed as the efficient cause of her injuries. Appellant's unfortunate condition is the result of the criminal act of those who deliberately wrecked the train, and not to any actionable conduct on the part of the appellee. The trial court, under the law and the evidence, properly directed a verdict for the defendant company.

It follows, therefore, that the judgment should be and is affirmed.