## Cumberland Hotel Operating Co. v. Hartman

(Decided April 24, 1936.)

301

GOLDEN, LAY & GOLDEN for appellant.

WOODWARD, DAWSON & HOBSON for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

The appellant, who was defendant in the trial court, asks for a reversal of a $2,200 verdict recovered against it by W. H. Hartman for injuries he sustained when he fell into defendant's elevator shaft.

In view of the property and time plaintiff lost, the extent of his earning power, his expenditures in effecting a cure of his injuries, and the seriousness of them, the amount of his recovery is not seriously questioned, nor could it be, for it is sustained by the record, if plaintiff is entitled to make any recovery. Plaintiff's right to recover at all is the chief question in the case, and that depends upon whether plaintiff was an invitee or a trespasser at the time and place that he received his injuries; hence we shall recount briefly the circumstances as disclosed in the evidence.

### The Facts.

In the late afternoon of Wednesday, February 15, 1933, Mr. Hartman became a guest of the defendant's hotel, and to him there was assigned room No. 146, which is situated on the second floor on the west side of the building, and opens into what defendant calls the "short hall."

After spending a short time in this room, the plaintiff at or near 6 p. m. started, so he testifies, to go to the lobby. He walked south along this short hall about 50 feet to the main hall, then turned and walked east along this main hall about 30 feet to the elevator, and pressed the button. He waited for it, as he thought, quite a bit overtime, two or three minutes, he says. About 40 feet farther east the main stairway to the lobby leads off this main hall. About 8 or 10 feet to the west of where he was standing at the elevator there was a door marked "stair-

way." The plaintiff does not claim to have seen this sign, but testified this door was open, that the room into which it led was lighted, and across this room about eight steps distant he thinks he saw a stairway. The plaintiff admits the halls he had traversed so far were carpeted and their walls were decorated and the floor in this room was bare and its walls were undecorated. For the defendant it is shown this door marked "stairway" leading to the main hall, which the plaintiff claims was open, was fitted with a door check that closes it automtically, and the undisputed testimony is that it was so closed when next noticed just after this accident.

The plaintiff passed through this room and descended this stairway to another room or hall, and at about the time he reached the foot of this stairway he met a servingman who asked him, "Are you going to the lobby?" When the plaintiff answered "Yes," this servingman, pointing to the left said, "Well, turn this way." If the plaintiff had gone as directed, he would have come to a wooden door that opened into the lobby, but, instead of following this direction, plaintiff turned to his right, where he found a door of glass and steel. Plaintiff pushed on this door, it slid to one side, and plaintiff stepped or fell into the elevator shaft and landed on the concrete floor at the bottom of it some 9 feet below.

Both these halls or rooms through which plaintiff had passed were lighted. As he passed through them, he had passed cases and barrels of soap, scouring preparations, and cleansing powder, had passed a sink for cleaning mops, the bellboys' dressing room, doors leading to the linen room, the cook's bedroom, the waiters' dressing room, the kitchen, and the toilet for the help. All must have been in good order, for plaintiff does not recall seeing any of them.

### The Elevator.

This is about a 100-room hotel, and the plaintiff says it is one of the best in this section of the country. It has an elevator that is used for both freight and passenger service; the cages being fitted with front doors opening onto the main hall which are used when passengers are being carried and with back doors op-

ening into these service rooms or halls which are opened and used when freight is being transported on the elevator. These doors are fitted with devices that close and lock them automatically, but on the particular door through which the plaintiff stepped or fell the lock on this occasion was not working; whether this was because of some defect in it or because some one had arranged it so it would not lock is not clearly established. It is immaterial what caused it to be in that condition. The stubborn fact is that it was not functioning normally, and that it was an act of negligence, as to any one expressly or impliedly invited to be there, to allow it to be so.

The question narrows down to this, Did the defendant owe a duty to the plaintiff then and there? To answer that question we must determine whether plaintiff there and then was an invitee or a trespasser. Before we answer this question, we are going to state some things found and held by other courts.

### The English Case.

This English case finally reached the House of Lords. See Walker et al. v. Midland Ry. Co., 55 Law Times N. S. p. 489. (A reference to this case is made in 32 C. J. p. 563, sec. 70, note 74 (b), where this case is cited as appearing in 51 J. P. 116.) This case is so much like the one before us we shall quote quite liberally from that opinion:

"The action was brought under Lord Campbell's Act, by the appellants, as the personal representatives of a Mr. Smith, who was killed by a fall at the Midland Hotel, St. Pancras, in May 1883, under circumstances which. appear fully in the judgment of the Earl of Selborne.

"The action was tried before Grove, J., and a special jury, when a verdict was found for the plaintiffs for 3,500 pounds damages; but this verdict was set aside by the Queen's Bench Division, and judgment was entered for the defendants, on the ground that there was no evidence of negligence on their part, and this judgment was affirmed in the Court of Appeals, as above mentioned. * * *

"The Earl of Selborne.—My Lords: The husband of the plaintiff, appellant here, lost his life

by falling down the well of a lift at the respondents' hotel at their St. Pancras station. The well in question was for a luggage lift, at the further end of a 'service' room * * * of which the door opened into a corridor on the third floor, containing sleeping apartments for guests; one of which apartments (nearly opposite to the service room) was occupied by the plaintiff and her husband, who had been for more than a day staying at that hotel. The door of the service room was shut but not locked (I think it appears by the evidence that it had no key); the well, which was seventeen feet from the door, had been left unfenced. There were iron doors at the entrance to it, by closing which it might have been fenced; these were left open. * * * This accident happened three hours or more after midnight. The deceased had been out late with a friend, and had only just returned to the hotel. * * * He went to his own room; and having occasion to go to a water-closet, asked his wife, twice over, where the place was. Without waiting for her answer, he went out into the corridor, where the gas lights were turned down, as was usual at that hour, so that there was some but not a clear or distinct light. No candles were used in the hotel; all the artificial light was from gas. There were proper water-closets, properly lighted within, with doors partly glazed, and having the letters 'W. C.' legible upon them, in an open recess of the same corridor, which the plaintiff's husband might have seen if he had gone only a few paces beyond the service room upon the same side. Those closets might have been seen by him as often as he ascended to or descended from the ocrridor, while staying at the hotel, as on every such occasion he passed to or from his room, in front of the recess where they were. It must be taken, however, that he had not actually observed them. What he did was to open the door of the service room, the first door he came to on crossing the corridor towards the left. It was distinguished from the doors of the sleeping apartments by having glass in the upper part, on which the word 'Service' was written, but not so as to be clearly legible by the light then in the corridor.

There was no light within. Just within the door, to the left, there was a sink in which there was some drip of water, the sound of which was perceptible outside. On opening the door it was apparent that the room was absolutely dark, and it must have been at once perceived that the drip of water came from the place where the sink was, which the deceased left behind him as he advanced into the room. He nevertheless, instead of continuing his search along the corridor for a water-closet properly lighted (which he would have found within a very short distance if he had done so), went into this dark room. It contained one or more tables, on the same side as the sink, and some luggage was lying on the floor; but with those things he does not seem to have come in contact. He made his way through the darkness to the further end, and there met the danger which cost him his life. The door of the room seems to have been found closed when search was afterwards made for him; this, at least, is the effect of the plaintiff's evidence, though the night watchman, Naef, says that the door was then open. This is a summary of the whole evidence, omitting nothing which can be regarded as favourable to the plaintiff's case. The statute under which the action was brought made it necessary for the plaintiff to prove that her husband's death was caused by such a 'wrongful act, neglect, or default' of the respondents as would have entitled him to maintain an action and recover damages for any injury (not mortal) which he might have sustained. This is not a question of any 'act' done by the respondents; it is one of alleged neglect or default. Wrongful neglect or default there could not be, unless a duty, which was not performed, was previously owing by the respondents towards the plaintiff's husband, or towards persons in the same situation, in respect of the place where the accident happened. Prima facie, there was no such duty, for the service room was a place in which no guest of the hotel had any right or legitimate occasion to be, and into which no such guest was expressly or impliedly invited to go. I think it impossible to hold that the general duty of an innkeeper to take prop-

er care for the safety of his guests extends to every room in his house, at all hours of night or day, irrespective of the question whether any such guests may have a right, or some reasonable cause to be there. The duty must, I think, be limited to those places into which guests may reasonably be supposed to be likely to go, in the belief, reasonably entertained, that they are entitled or invited to do so. Unless there was evidence fit for the consideration of a jury that any guest in the position of the deceased would, in the darkness of night, have reasonable ground for believing this service room to be a water-closet, and for acting as he did, there is nothing else in the case which (as it seems to me) could make the respondents' omission to provide against dangers within that service room wrongful towards the plaintiff's husband or generally towards their guests; for there was no other ground on which the presence of any guest there could reasonably be explained or excused. Were, then, those circumstances connected with this room, which alone can be supposed to have suggested to the mind of the deceased that it might be a water-closet, enough to furnish reasonable ground for a belief, on which a guest in the situation of the deceased might reasonably act in the way he did, that this service room was a water-closet? This seems to me to be the question, putting it most favorably for the appellant. Those circumstances were the glass in the door and the audible drip of water within. I do not add the absence of light; for to me it would not seem reasonable to expect that water-closets intended for use at night in such a hotel, would be left unlighted. But the glass in the door no more denoted a water-closet [there being no light within] than it did any other kind of room, passage, or place, which might receive borrowed light from the corridor, such, for instance, as a service room, a housemaid's closet, or the entrance to a passage or back staircase. And the drip of water would be left behind by anyone advancing, as the plaintiff's husband did, into the room, and could not be supposed by any such person to denote the situation of the object of his search. At the most, these cir-

cumstances might explain his first act, in opening the door to see what [if anything] might be discernible within; but when he had done this, and found the room quite dark, I cannot regard either of them alone, or both together, as furnishing reasonable ground for his going forward in the dark to the place where he fell, instead of proceeding a little further along the corridor, where proper water-closets, with proper lights, might have been found. Would the respondents have been wrongdoers towards him [all other circumstances being the same] if he had come to a steep staircase instead of the unguarded well of a lift, and had fallen down it? I think not; and, if not, I do not think they can be liable because it was the well of a lift with iron doors, which had been purposely or inadvertently, left unclosed. The magnitude of a particular danger, to anyone who may happen to come in the way of it unawares, may doubtless enhance the responsibility of the person to whom it is imputable, for the neglect of any duty which he owes to persons whom he leaves exposed to it; but I do not see how it can create such a duty, when the person who suffers would not, in the proper and ordinary course of things, or without his own unauthorized and unreasonable act, have been within the reach of the danger at all. * * * In considering whether there was any evidence of neglect of duty by the respondents, it would not, in my opinion, be right to leave out of sight the fact that they did not so conduct their hotel as to drive their guests to grope about in dark places, or to explore unknown rooms in order to find water-closets. These conveniences were provided on that corridor, in positions easily accessible, and easily discoverable by any guests in the circumstances of the appellant's husband, who might endeavour, with reasonable care and patience, to observe or to find them; and they were kept properly lighted at night. Much as I regret the terrible result to the plaintiff's husband, I cannot hold the respondents responsible for it. The majority of the learned judges in the Court of Appeal, and all the judges of the Queen's Bench Division, before whom the case came, thought that there was no evidence of

any wrongful neglect or default towards the plaintiff's husband on the respondent's part. I am unable to differ from them. * * * I therefore move your Lordships to dismiss this appeal."

### The North Carolina Case.

In Money, Adm'r of Salmons, v. Travelers' Hotel Co., 174 N. C. 508, 93 S. E. 964, 966, L. R. A. 1918B, 493 Salmons was not a guest of the hotel, but had gone to the room of a guest of the hotel to get a drink. After he had partaken of the desired refreshment, Salmons left the room, wandered off the main hallway into a service hallway, and finally opened the insecurely fastened door of a freight elevator shaft, down which he fell and was killed. A directed verdict for the defendant was affirmed on appeal. That opinion contains a lucid and well-reasoned discussion of the principles involved, but, since that opinion is readily accessible, we shall content ourselves by making this single quotation from it:

"If, however, the deceased was entitled to the protection of a guest, there could be no recovery on this record, because he was injured in a part of the hotel reserved for employees, and to which there was no express or implied invitation."

### The Kentucky Cases.

In Smith v. Trimble, 111 Ky. 861, 64 S. W. 915, 23 Ky. Law Rep. 1206, Smith, while hanging paper for Trimble, stepped out onto a balcony to call to a fellow workman below. The balcony fell and Smith was injured. This court affirmed a judgment entered on a directed verdict.

In Indian Refining Co. v. Mobley, 134 Ky. 822, 121 S. W. 657, 24 L. R. A. (N. S.) 497, a $5,000 judgment for injuries was reversed for a directed verdict. Mobley had gone to the refining company's plant for the purpose of soliciting insurance, and while there was injured.

In Wall v. F. W. Woolworth Co., 209 Ky. 258, 272 S. W. 730, we affirmed a judgment entered on a directed verdict. Mrs. Wall had stepped behind defendant's counter to assist in untangling some clothesline and fell down a stairway and was injured.

Numerous authorities are cited in the above opinions, and need not be here repeated.

When this hotel became host to Mr. Hartman and he became its guest, it became the duty of the hotel to keep his goods safe from loss or injury and to exercise reasonable care for his safety. 32 C. J. p. 541, sec. 27. Certain of its premises were assigned to his exclusive use, and he was permitted and invited to use other parts of the hotel in common with the other guests, but the proper discharge of its duty to him and to its other guests required that it retain certain other parts for the use of its servants engaged and kept for the service of Mr. Hartman and its other guests. The hotel retained certain rights of privacy, and there was not given to Mr. Hartman any right to run all over the building. It was also the duty of the hotel to keep those parts of its building its guests were invited to use ordinarily in a reasonably safe condition. 32 C. J. p. 562, sec. 70. It has even been held a guest is a trespasser where at a time when no emergency exists he gets upon a fire escape. Marr v. Whistler, 49 Cal. App. 364, 193 P. 600.

The innkeeper is not expected or required to assign to the guest a guard to watch over him, and the guest would resent that as an act of espionage if it were done.

In Clarke's Adm'r v. Louisville & N. R. Co., 101 Ky. 34, 39 S. W. 840, 18 Ky. Law Rep. 1082, 36 L. R. A. 123, Clark, while allowing his arm to protrude from a car window, was struck by a timber in a tunnel and killed, and his administrator was not allowed to recover. See, also, Louisville & N. R. Co. v. Sickings, 5 Bush (68 Ky.) 1, 96 Am. Dec. 320.

Plaintiff's injury in this case was not one the hotel could reasonably have anticipated.

In the case of Sydnor v. Arnold, 122 Ky. 557, 92 S. W. 289, 290, we said:

"The weight of authority seems to be against holding a defendant liable for all the consequences of his wrongful acts when they are such as no human being even with the fullest knowledge of the circumstances would have considered likely to occur, and the rule is well settled that to fix liability upon

a person for remote negligence the injury complained of must be one that under all the circumstances might have been reasonably foreseen or anticipated by a person of ordinary prudence to flow from or be the natural and probable consequence of the first negligent or wrongful act. These views are fully supported and illustrated in the following cases''—citing many cases.

In the case of Illinois Central Railroad Company v. Cash's Adm'x, 221 Ky. 655, 299 S. W. 590, 593, we said:

"If the ordinary experiences of humanity in connection with a particular act do not lead an ordinarily prudent person under the conditions and circumstances under which the act is performed to reasonably anticipate or foresee that an injury will result from the doing of the act, then the one doing the act cannot be held responsible for resulting injuries to another."

In the case of Riley v. Louisville & N. R. Co., 231 Ky. 564, 21 S. W. (2d) 990, 991, we said:

"While the highest degree of care is demanded, the carrier is bound to guard only against those occurrences which can reasonably be anticipated by the utmost foresight. 'It has been well said that, "if men went about to guard themselves against every risk to themselves or others which might, by ingenious conjecture, be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things." ' "

Certainly no higher degree of care is required of a hotel.

The trial court erred when it overruled the motion for a directed verdict made by the hotel company at the close of the plaintiff's evidence and renewed at the close of all the evidence, for which errors the judgment is reversed.